IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MICHAEL WEBB, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO.  4:20-cv-297 |
| TIMBERPARK CONSTRUCTION, | § | |
| INC.; RELIABLE PAVING, INC. d/b/a | § | |
| RELIABLE COMMERCIAL | § | |
| CONSTRUCTION; MARK D. HIXSON | § | |
| | § | |
| | § | |
| *Defendants*. | § | JURY DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

**TO THE HONORABLE JUDGE OF SAID COURT:**

Plaintiff Michael Webb files this Fair Labor Standards Act action against his former employers, Defendants Timberpark Construction, Inc., Reliable Paving, Inc. d/b/a Reliable Commercial Construction, and Mark D. Hixson, to recover unpaid overtime wages and other statutorily authorized damages from Defendants.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

3. Venue is also proper in the Sherman Division of the Eastern District of Texas because

Plaintiff performed a substantial amount of work for Defendants in Collin and Denton County, including overtime work that Defendants did not compensate at an overtime rate, and thus substantial violations of Plaintiff's FLSA rights occurred in counties within the Sherman Division.

## PARTIES

4. Plaintiff Michael Webb is a resident of Dallas County, Texas, and at all times relevant to this case lived in the City of Garland, Texas.

5. Defendant Timberpark Construction, Inc. is a corporation organized and existing under the laws of the State of Texas that does business and works on construction projects in Collin County, Denton County, and other surrounding counties.

6. Defendant Mark D. Hixson is an individual who is the President and Director of Timberpark Construction, Inc., and the Vice President and Treasurer of Reliable Paving, Inc. d/b/a Reliable Commercial Construction.

7. Defendant Reliable Paving, Inc. d/b/a Reliable Commercial Construction is a corporation organized and existing under the laws of the State of Texas that does business and works on construction projects in Collin County, Denton County, and other surrounding counties.

8. Whenever in this Complaint it is alleged that Defendants committed any act or omission, it is meant that each of the named Defendants, Timberpark Construction, Inc., Mark D. Hixson, and Reliable Paving, Inc. d/b/a Reliable Commercial Construction committed such act or omission, and/or authorized, ratified, and approved of the act or omission if committed by one or both of the other Defendants or by Defendants' supervisory employees and agents.

## FACTS – FLSA COVERAGE

9. Defendant Timberpark Construction, Inc. employed Michael Webb as an installer to

perform installation work at construction sites.

10. Defendant Timberpark Construction, Inc. employed Michael Webb from June 5, 2016 through February 21, 2020.

11. All of the construction sites Michael Webb worked on for Timberpark Construction, Inc. were Reliable Paving, Inc. construction sites.

12. Reliable Paving, Inc. and Timberpark Construction, Inc. were an integrated enterprise.

13. Reliable Paving, Inc. and Timberpark Construction, Inc. had common owners, including Mark D. Hixson.

14. Reliable Paving, Inc. and Timberpark Construction, Inc. had common management, including Mark D. Hixson.

15. Reliable Paving, Inc. and Timberpark Construction, Inc. had interrelated operations, including working on the same construction contracts and construction sites, and jointly determining the operating budgets, personnel assignments, and management of those projects.

16. There was centralized control over labor relations between Reliable Paving, Inc. and Timberpark Construction, Inc.

17. Defendant Mark D. Hixson had the power to hire and fire Timberpark Construction, Inc. employees, including Michael Webb.

18. Defendant Mark D. Hixson also had the power to hire and fire Reliable Paving, Inc. employees.

19. Defendant Mark D. Hixson had the power to decide whether to classify and pay Timberpark Construction, Inc. employees like Michael Webb as independent contractor or employees.

20. Defendant Mark D. Hixson had the power to decide whether to classify and pay Reliable Paving, Inc. employees as independent contractor or employees.

21. Defendant Mark D. Hixson had the power to set the pay rates of Timberpark Construction, Inc. employees like Michael Webb.

22. Defendant Mark D. Hixson had the power to set the pay rates of Reliable Paving, Inc. employees.

23. Defendant Mark D. Hixson had the power to set the schedules and work rules for Timberpark Construction, Inc. employees like Michael Webb.

24. Defendant Mark D. Hixson had the power to set the schedules and work rules for Reliable Paving, Inc. employees.

25. Defendant Mark D. Hixson and the other common owners and managers of Timberpark Construction, Inc. and Reliable Paving, Inc. coordinated the labor relations policies and practices of the two companies to maximize the profit that the two companies could earn from the construction projects the two companies jointly managed and executed.

26. Defendants intentionally misclassified Michael Webb and other installers and construction laborers employed by Timberpark Construction, Inc. as an independent contractors.

27. Defendants decided to misclassify Michael Webb and other installers and construction laborers employed by Timberpark Construction, Inc. as an independent contractors in order to:

>(a) avoid having to include Timberpark Construction, Inc. employees on Reliable Paving, Inc.'s workers compensation insurance policy and pay the higher premiums that would be associated with having additional employees on the policy;

>(b) avoid paying unemployment insurance for Timberpark Construction, Inc. employees;

>(c) avoid paying the employer's share of FICA taxes for Timberpark Construction, Inc.

employees;

(d) avoid paying overtime premium wages to Timberpark Construction, Inc. employees;

(e) avoid providing other benefits and protections to Timberpark Construction, Inc. employees as would have been required by other Federal and state laws; and

(f) provide Defendants' a competitive edge in quoting lower prices for projects than competitors due to Defendants' savings on labor costs

28. Defendants also intentionally decide to hide the fact that Timberpark Construction, Inc. and Reliable Paving, Inc. had common management and common ownership from Timberpark Construction, Inc. employees like Michael Webb.

29. Defendant hid the fact that Timberpark Construction, Inc. and Reliable Paving, Inc. had common management and common ownership from Timberpark Construction, Inc. employees like Michael Webb to avoid having Webb and other Timberpark Construction, Inc. employees insist on having the same employment protections and rights as Reliable Paving, Inc. employees.

30. Michael Webb asked multiple times why Reliable Paving, Inc. employees were paid overtime and Timberpark Construction, Inc. employees were not paid overtime for work on the same construction sites.

31. No one ever informed Michael Webb in response to his questions that Timberpark Construction, Inc. and Reliable Paving, Inc. had common management and common ownership.

32. Michael Webb did not know that Mark D. Hixson was an officer and manager of both Timberpark Construction, Inc. and Reliable Paving, Inc. until the attorney he hired to investigate his claims looked up both companies' Public Information Reports on the Texas Secretary of State's website.

33. Michael Webb was in fact Defendants' employee.

34. Defendants controlled every aspect of Michael Webb's employment.

35. Defendants set Michael Webb's pay rate as an hourly pay rate.

36. As a result of his hourly pay rate, Michael Webb had no opportunity for profit or loss.

37. Defendants decided whether and when to increase or decrease Michael Webb's hourly pay rate.

38. Defendants decided when and how to pay Michael Webb.

39. Defendants paid Michael Webb on a weekly basis by check, with any shorted hours made up for in cash.

40. Defendants controlled Michael Webb's work schedule.

41. Defendants told Michael Webb which job sites to report to at what time, when to take a lunch break and for how long, and when to leave for the day.

42. Defendants determined how many days per week Michael Webb had to work any given week.

43. Defendants assigned a supervisor, Mr. Hung, to supervise Michael Webb's work.

44. Mr. Hung directed Michael Webb's work at each work site throughout each work day.

45. Mr. Hung told Michael Webb what part of the job site to work on and what projects to complete when.

46. Mr. Hung enforced workplace rules such as whether Michael Webb could take breaks, use his cellular phone for personal purposes on the worksite, or leave early for personal reasons.

47. Mr. Hung enforced workplace rules by sending workers home and thereby reducing their

weekly pay.

48. Defendants decided what supplies and equipment to provide Michael Webb and what tools Michael Webb would be required to bring to the job site.

49. Defendants made the vast majority of investment necessary for Michael Webb to perform his job.

50. Defendants provided all of the materials, all of the supplies, and most of the equipment and tools that Michael Webb used during his employment with Defendants.

51. Defendants procured and paid for all of the contracts, subcontracts, building permits, insurance, administrative staff and services, supervisory staff, and labor for all of the construction projects Michael Webb worked on through Defendants.

52. While Michael Webb was good at his job and the drywall and other installation work he performed required some skill, the position of installer is a common low-level job in the construction industry that does not require any formal education or highly specialized skills or training.

53. The Dictionary of Occupational Titles lists an installer as a position requiring only 3 to 6 months of vocational training.

54. On information and belief, many constructions companies in the DFW area, including Defendant Reliable Paving, Inc., hire installers as employees and pay their installers overtime wages for overtime work.

55. On information and belief, Mark D. Hixson, who was the treasurer and Vice President of Reliable Commercial Construction, knew that he should be treating the installers like Michael Webb who worked for him as employees.

56. On July 30, 2019, Defendant Mark D. Hixson wrote a letter confirming that Michael

Webb was an employee of Timberpark Construction, Inc., that Timberpark Construction, Inc. paid Michael Webb by the hour, and that Timberpark Construction, Inc. had a minimum 40-hour work week for its employees:

**Timberpark Construction, Inc.**
715 W. Harris Rd, Arlington, TX 76001
817-909-2871

Date: July 30, 2019
RE: Michael Webb Jr. - Wages

To Whom It May Concern,

Michael Webb Jr. is an employee of Timberpark Construction, Inc. He is currently being paid $20.00 per hour. We have a minimum forty-hour work week. Michael Webb Jr. is in good standing with the company. If you have any questions or concerns please give me a call.

Sincerely,

Mark D Hixson
President

57. In 2017, 2018, 2019, and 2020, Defendants' gross annual exceeded $500,000 per year. *See* https://www.zoominfo.com/c/reliable-commercial-construction/348259449.

58. Defendants also, at all relevant times, employed employees who engaged in commerce, engaged in the production of goods for commerce, or handled or otherwise worked with goods, materials, and equipment that had been moved in or produced for commerce.

59. Defendants' installers, including Michael Webb, used equipment manufactured by Bobcat, Genie, and JLG that travelled to Texas through interstate commerce within the United States of America.

60. Defendants' installers, including Michael Webb, used building materials and supplies purchased from Mueller, USG, and Hoover Treated Wood Products, Inc. (Pyroguard) that had travelled to Texas through interstate commerce within the United States of America.

61. Defendants' installers, including Michael Webb, also regularly utilized interstate telecommunications networks in the course of their job duties, including communicating with their supervisor via cellular phones.

### FACTS- FLSA VIOLATIONS

62. Defendants did not provide a punch clock or any other system for Webb to record the number of hours he worked each day.

63. Defendants did not give Webb access to paper copies of his schedule.

64. Defendants did not require or allow Webb to review and sign off on the number of hours he worked each day or each week.

65. Defendants' site supervisor Mr. Hung would provide the number of hours Webb worked to the main office.

66. Defendants would then cut Webb a check for some or all of the hours Mr. Hung reported on Webb's behalf.

67. Defendants' site supervisor Mr. Hung frequently underreported the number of hours Webb actually worked.

68. Defendants therefore frequently underpaid Webb, not paying him for all of the hours he actually worked.

69. Sometimes Defendants acknowledged that they had shorted Webb on his check.

70. Sometimes Defendants would pay Webb in cash for the hours he was shorted.

71. Defendants would then add the shorted hours to Webb's next check and require Webb to pay the cash "advance" back to Defendants.

72. The amount of both the check and cash payments Webb received always reflected a calculation of a certain number of hours of work times a straight hourly rate.

73. Defendants' time-keeping and payroll practices made it difficult for Webb to keep track of whether he had been paid for all of the hours he worked even at his straight hourly rate.

74. Webb did know, however, that Defendant never paid him overtime for the hours he worked in excess of 40 hours per week.

75. While Defendants varied Webb's schedule from week to week and project to project, for a period of time Defendants assigned Webb a schedule working seven days a week from 7am to either 6pm or 3pm each day.

76. During the time Webb worked that seven day per week schedule, Defendants paid Webb a straight hourly wage for the hours he was scheduled to work.

77. While the amount of overtime hours Webb worked varied over time, there were weeks in 2017, 2018, 2019, and 2020 when Webb worked more than 40 hours per week.

78. Defendants, however, never paid Webb one and a half times Webb's hourly rate for hours that Webb worked in excess of 40 hours week.

79. For example, on July 13, 2017, Defendants paid Webb a total of $720 reflecting Webb a straight hourly rate of $15 per hour times 48 hours of work.

80. Defendant did not pay Webb any premium overtime wages on July 13, 2017 even though Webb's supervisor Mr. Hung had reported that Webb had worked 48 hours that prior work

week.

81. Webb did in fact work 48 or more hours in the work week covered by the July 13, 2017 check.

82. Webb's hourly pay rate was set at $15 per hour for the work week covered by the July 13, 2017 check.

83. For another example, on August 10, 2017, Defendants paid Webb $712.50 reflecting payment at a straight hourly rate of $15 per hour for 47.5 hours of work.

84. Defendant did not pay Webb any premium overtime wages on August 10, 2017 even though Webb's supervisor Mr. Hung had reported that Webb had worked 47.5 hours in that prior work week.

85. Webb did in fact work 47.5 or more hours in the work week covered by the August 10, 2017 check.

86. Webb's hourly pay rate was set at $15 per hour for the work week covered by the August 10, 2017 check.

87. For another example, on October 19, 2017, Defendants paid Webb a straight hourly rate of $16 per hour for 46.5 hours of work for a total of $744.

88. Defendant did not pay Webb any premium overtime wages on October 19, 2017 even though Webb's supervisor Mr. Hung had reported that Webb had worked 46.5 hours in that prior work week.

89. Webb did in fact work 46.5 or more hours in the work week covered by the October 19, 2017 check.

90. Webb's hourly pay rate was set at $16 per hour for the work week covered by the

October 10, 2017 check.

91. For another example, on January 11, 2018, Defendants paid Webb $688 reflecting a payment of a straight hourly rate of $16 per hour for 43 hours of work.

92. Defendant did not pay Webb any premium overtime wages on January 11, 2018 even though Webb's supervisor Mr. Hung had reported that Webb had worked 43 hours in that prior work week.

93. Webb did in fact work 43 or more hours in the work week covered by the January 2, 2018 check.

94. Webb's hourly pay rate was set at $16 per hour for the work week covered by the October 10, 2017 check.

95. For another example, on August 8, 2019, Defendants paid Webb $580, reflecting a payment of $880 at a straight hourly rate of $20 per hour for 44 hours of work minus a $300 deduction for repayment of a loan Defendants had given to Webb.

96. Defendant did not pay Webb any premium overtime wages on August 8, 2019 even though Webb's supervisor Mr. Hung had reported that Webb had worked 44 hours in that prior work week.

97. Webb did in fact work 44 or more hours in the work week covered by the August 8, 2019 check.

98. Webb's hourly pay rate was set at $20 per hour for the work week covered by the August 8, 2019 check.

99. For another example, on January 23, 2020, Defendants paid Webb a straight hourly rate of $17 per hour for 46 hours of work for a total of $782.

100. Defendant did not pay Webb any premium overtime wages on January 23, 2020 even though Webb's supervisor Mr. Hung had reported that Webb had worked 46 hours in that prior work week.

101. Webb did in fact work 46 or more hours in the work week covered by the January 23, 2020 check.

102. Webb's hourly pay rate was set at $17 per hour for the work week covered by the January 23, 2020 check.

103. On a number of occasions, Webb asked Mr. Hung and other site supervisors why Timberpark Construction, Inc. did not pay its installers and other laborers overtime.

104. Timberpark Construction, Inc. did not conduct a review of its employee classification and payroll policies and practices in response to Webb's inquiries.

105. Timberpark Construction Inc. did not change its employee classification or payroll policies or practices in response to Webb's inquiries.

106. In January of 2020, a lead worker employed by January 23, 2020 told Webb that Timberpark Construction, Inc. was supposed to be paying its workers time and a half.

107. On information and belief, Defendants willfully misclassified and failed to pay an overtime rate to Timberpark Construction, Inc. installers and construction laborers to increase their own profit margin.

109. On information and beliefs, Defendant Mark D. Hixson intentionally and willfully set up and used the corporate entity Timberpark Construction, Inc. to decrease the estimated and actual labor costs on the projects of Reliable Paving, Inc. to benefit the owners of both companies.

110. No exemption excuses the Defendants from failing to pay Webb at an overtime rate for

the overtime hours he worked.

# FIRST CLAIM FOR RELEF –
## FLSA OVERTIME & MINIMUM WAGE VIOLATIONS

111. Plaintiff Michael Webb re-alleges and incorporates by references paragraphs 1 through 110.

112. At all relevant times, each of the Defendants were employers within the meaning of the FLSA.

113. At all relevant times, each of the Defendants employed and/or continue to employ, Plaintiff within the meaning of the FLSA.

114. At all relevant times, Timberpark Construction, Inc. and Reliable Paving, Inc. were an integrated enterprise and/or joint employers.

115. At all relevant times, Mark D. Hixson was a person acting on behalf and in the interests of Timberpark Construction Inc. and Reliable Paving, Inc.

116. Defendants failed to pay Plaintiff one and a half times his hourly rate of pay for hours worked in excess of forty hours per week.

117. Defendants also failed to pay Plaintiff for all of the hours he worked, denying Plaintiff payment at even the minimum wage for some of the hours that he worked.

118. Defendants' violations of the FLSA was knowing and willful.

119. As a result of the Defendants' failure to pay Plaintiff at an overtime rate for overtime hours Plaintiff worked, the Defendants have violated and continue to violate the FLSA, 29 U.S.C §201 et seq., including 29 U.S.C. §207(a)(1) and 215(a).

120. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the

meaning of 29 U.S.C. §255(a).

121. Due to the Defendants' willful FLSA violations, Plaintiff will respectfully ask that the Court, on summary judgment, or a jury of his peers, at trial, award him his unpaid overtime wages for all overtime hours he worked in the past three years, an additional amount equal to his unpaid overtime wages as liquidated damages, and reasonable attorneys' fees, and costs, pursuant to 29 U.S.C. §216(b).

## DEMAND FOR TRIAL BY JURY

122. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this Complaint.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that this Court grant the following relief:

1. Award Plaintiff all of his unpaid overtime wages for all overtime hours he worked in the past three years;

2. Award Plaintiff liquidated damages as a result of the Defendants' willful failure to pay Plaintiff overtime for the overtime hours Plaintiff worked pursuant to 29 U.S.C. §216(b);

3. Award Plaintiff any and all pre-judgment and/or post-judgment interest that the law allows the Court to award;

4. Award Plaintiff court costs and expenses of this action together with reasonable and necessary attorneys' fees and expert fees for both the proceedings in this Court and for any and all appeals;

5. Find Defendants jointly and severally liable for Plaintiff's damages; and

6. Issue any other equitable or further relief this Court deems just and proper.

DATED: April 10, 2020	Respectfully submitted,

TREMAIN ARTAZA PLLC

*/s/ Christine A. Hopkins*
Christine A. Hopkins
Texas State Bar No. 24095768
13140 Coit Rd., Suite 104
Dallas, TX 75240
christine@tremainartaza.com
Telephone: 469-573-0297
Facsimile: 214-254-4941

**ATTORNEY FOR PLAINTIFF**